**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**

RENAISSANCE LEARNING, INC. )
)
Plaintiff, )
)
v. ) Case No. 4:07-0413-CV-W-SWH
)
METIRI GROUP, LLC, )
)
)
Defendant. )

**PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO**
**DEFENDANT'S SECOND MOTION IN LIMINE**

Plaintiff Renaissance Learning, Inc. ("RLI") opposes defendant Metiri Group, LLC's

("Metiri's") motion in limine to exclude the expert testimony and expert report of Dr. G. William

Kennedy.

Dr. Kennedy's qualifications, proffered testimony, and expert analysis are substantial,

more than sufficient under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993),

and clearly meet the requirements of Federal Rule of Evidence 702. Dr. Kennedy is a Certified

Public Accountant with a Ph.D. in Finance from Saint Louis University and over thirty years of

experience in finance, statistics, and economic valuation. Dr. Kennedy's qualifications and

analysis are clearly reliable.

Metiri's motion also reflects a fundamental misunderstanding and mischaracterization of

the basis and substance of Dr. Kennedy's opinion. Dr. Kennedy performed a statistical analysis

of the difference in sales between the group of schools that were likely to have been exposed to

the false and disparaging statements and those schools that were not. As even Metiri's expert

admits, there is absolutely no reason to believe that there is any other difference between these

two groups of schools. Dr. Kennedy also performed a well accepted test to determine whether or

not the difference in sales between the two groups of schools is statistically significant, and he determined that there is a less than 0.1% probability that the difference is caused by random sales variations. Metiri's attacks on Dr. Kennedy's methodology wholly fail to account for the well-accepted and supported statistical analysis that Dr. Kennedy performed.

Metiri's motion should be denied.

## I.    FACTUAL BACKGROUND

RLI retained Dr. Kennedy to calculate the economic damages RLI sustained as a result of Metiri's false and disparaging statements about Accelerated Reader (Expert Report of G. William Kennedy, Ph.D., CPA/ABV ("Kennedy Rep."), attached as Exhibit 1, at 1). Dr. Kennedy did not undertake this task lightly. He performed a comprehensive investigation of the facts and reviewed hundreds of pages of documents, including deposition transcripts, declarations, exhibits, sales and accounting data, and other materials about RLI and Metiri (id. at 8).

To determine the effect of Metiri's false and disparaging statements, Dr. Kennedy analyzed RLI's sales data for its Accelerated Reader product line for the years 1999 – 2008 (id. at 3). Because the false and disparaging statements had been made by Metiri in a number of different forums and using a number of different mediums – including directly to the Chicago Public School District as early as 2002 (Deposition of Cheryl Lemke, February 26, 2008 ("Lemke Dep."), attached as Exhibit 2, at 73; Deposition of Coughlin ("Coughlin Dep."), attached as Exhibit 3, at 81-84 and 86), through public presentations starting as early as 2003 (Coughlin Dep., Ex. 3 at 103-105), through beta testing of the TSW database starting in 2003 (id. at 97-99), through direct marketing of TSW to various school districts (Coughlin Dep., Ex. 3 at 186-189; Lemke Dep., Ex. 2 at 198-200), through the publicly-available portions of the Metiri

2

website (see, e.g., http://www.metiri.com/TSW_videos.html (last accessed October 19, 2009), and through the subscription TSW database starting in late 2003 (Lemke Dep., Ex. 2 at 49 and 130-140) – there was no way to determine with certainty all of the school districts which had been exposed to Metiri's statements. Indeed, Dr. Kennedy expressly recognized that many of the statements had entered the "public domain" as a result of "information leakage" – that is, teachers and school administrators talking to each other and repeating what Metiri had said about Accelerated Reader (Kennedy Rep., Ex. 1 at 3).

Accordingly, Dr. Kennedy broke the RLI sales data up into two populations: schools with a likelihood of exposure to Metiri's false and disparaging statements and schools without such a likelihood (id.). Dr. Kennedy determined that schools with a subscription to Metiri's TSW database or within the scope of such a subscription (e.g., the schools with access to a statewide subscription) had a greater likelihood of having been exposed to the false and disparaging statements than those schools without a subscription (id. at 3 and 6). It is these two groups of schools that form the basis for Dr. Kennedy's statistical analysis (id. at 3).

Dr. Kennedy then compared the changes in Accelerated Reader sales over time between these two groups (id.). These two groups of schools consist of enormous sample sizes for purposes of statistical analysis (id.). For example, in 2002 alone, RLI had total sales of Accelerated Reader software, hardware, and related services of approximately $56.1 million, consisting of approximately $8.7 million to the group of schools which became TSW subscribers (more than 9800 in total) and $47.4 million to the group which did not (id.). Due to the sample sizes involved, there is absolutely no reason to think that any other possible variable would have affected RLI sales to these two groups (Deposition of Christopher Pflaum ("Pflaum Dep."), attached as Exhibit 4, at 56-57. In other words, one would expect that other factors that could

3

affect RLI's sales – such as, "competing products, marketing, changes in student need, or funding available" (Motion at 6) – would affect these two groups equally.

Because Metiri started publicizing its review of Accelerated Reader in 2002 (to Chicago) and 2003 (in presentations and to beta testers and other early subscribers), Dr. Kennedy selected fiscal year 2002 as a base year, the starting point of his comparative analysis for purposes of determining whether there was a statistically significant difference in sales growth between these two groups (id.). Dr. Kennedy's calculations, presented in a table on page 3 of his report, indicate significant differences in the change in Accelerated Reader sales between the two groups of RLI customers:

| Year | Metiri Clients | Metiri Clients Index | Non-Metiri Clients | Non-Metiri Clients Index | Index Delta | But For Sales | Lost Sales |
|------|---------------|---------------------|--------------------|-------------------------|-------------|---------------|------------|
| 2002 | $8,667,408 | 100% | $47,444,709 | 100% | 0% | $8,667,408 | $0 |
| 2003 | $7,112,838 | 82% | $41,850,027 | 88% | -6% | $7,645,347 | ($532,509) |
| 2004 | $7,156,494 | 83% | $44,077,142 | 93% | -10% | $8,052,206 | ($895,712) |
| 2005 | $6,927,857 | 80% | $42,351,405 | 89% | -9% | $7,736,941 | ($809,084) |
| 2006 | $7,456,970 | 86% | $48,032,112 | 101% | -15% | $8,774,717 | ($1,317,748) |
| 2007 | $8,334,838 | 96% | $52,047,041 | 110% | -14% | $9,508,182 | ($1,173,344) |
| 2008 | $8,499,506 | 98% | $52,878,964 | 111% | -13% | $9,660,161 | ($1,160,656) |
| | | | | | | $60,044,961 | ($5,889,051) |

(id. at 3 and 6)

Regardless of whether sales increased or decreased in a given year, the group of schools with the increased likelihood of exposure to Metiri's statements lagged far behind the control group of schools in purchasing Accelerated Reader (id.). Dr. Kennedy identified the but for sales by applying the sales index for non-subscribers to the Metiri-subscriber sales (id. at 3). As the graph at page 6 of his report illustrates, the sales index for Metiri subscribers closely tracked that of non-Metiri subscribers until Metiri began making the false and disparaging statements:

4



Indexed Sales: Metiri Clients Vs. Non-Metiri Clients

1999 Base Year

(id. at 6). Between 2003 and 2008, however, the gap in the sales index between the two groups of schools significantly widened. Dr. Kennedy calculated RLI's lost sales by assessing the difference between RLI's actual sales and but for sales of Accelerated Reader to Metiri subscribers (id.). After identifying RLI's lost sales for 2003 – 2008, Dr. Kennedy determined RLI's lost profits attributable to Metiri's false and disparaging statements by using RLI's incremental profit margins on the lost sales (id. at 3-4).

Applying sound statistical methodology and principles, Dr. Kennedy assessed the statistical significance of Metiri's effect on sales of Accelerated Reader (id. at 5). For each year between 2003 and 2008, the change in sales was statistically significant to a very high degree – in other words, there is a less than 0.1% chance that the sales difference are attributable to random variations:

5

| Year | But For Sales | Lost Sales | T-Stat on Lost Sales | Statistical Significance |
|------|---------------|------------|----------------------|--------------------------|
| 2003 | $7,645,347 | ($532,509) | (4.27) | 99.9%+ |
| 2004 | $8,052,206 | ($895,712) | (7.18) | 99.9%+ |
| 2005 | $7,736,941 | ($809,084) | (6.49) | 99.9%+ |
| 2006 | $8,774,717 | ($1,317,748) | (10.57) | 99.9%+ |
| 2007 | $9,508,182 | ($1,173,344) | (9.41) | 99.9%+ |
| 2008 | $9,660,161 | ($1,160,656) | (9.31) | 99.9%+ |

(id. at 5). As Dr. Kennedy stated, he "determined by performance of well-accepted statistical tests that, with a 99% confidence level, the plaintiff's sales of AR products to Metiri subscribers during this time period were materially impaired" (id. at 3). Metiri has not proffered *any evidence whatsoever* attributing the difference in the sales between Metiri subscribers and non-Metiri subscribers to anything other than the higher likelihood of exposure to Metiri's false and disparaging statements.

## II.   **ARGUMENT**

Dr. Kennedy's opinion far exceeds this Court's standards for admissibility. Under Federal Rule of Evidence 702, expert testimony is admissible if it is both (1) reliable and (2) relevant. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). Daubert establishes the district court as a "gatekeeper" to prevent the admission of subjective beliefs or unsupported speculation in the guise of expert testimony. 509 U.S. at 590. The threshold for exclusion is clear, and it is high: expert opinion may only be excluded when the opinion "is so fundamentally unsupported that it can offer no assistance to the jury." Bonner v. ISP Tech., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001).

That is not the case here. Dr. Kennedy has studied, taught, and performed research in the fields of finance and statistics for over three decades (Kennedy Rep., Ex. 1 at 1-2). For the

majority of that time, he has specialized in economic valuation and the use of statistics in financial analysis (id. at 9-12). He is a Certified Public Accountant and has received professional designations related to his business valuation experience (id. at 1). Dr. Kennedy has published and presented his research in dozens of peer-reviewed journals and conferences nationally (id. at 9-16). His opinion is based in sound methodology and reliable principles. Given the depth of Dr. Kennedy's education, experience, and expertise, Metiri's suggestion to the contrary is illogical and insulting. Dr. Kennedy's opinions are sufficiently tied to the facts of this case and based upon rigorous scientific methodology. In addition, Metiri's attacks reflect a fundamental misunderstanding of the nature of Dr. Kennedy's analysis. For all of these reasons, Metiri's motion should be denied.

A.  Dr. Kennedy's Opinions Are Sufficiently Connected to the Evidence and Facts of the Case.

Metiri's first argument against Dr. Kennedy's opinions is that the opinions lack sufficient factual support. Metiri alleges three specific factual infirmities: (1) that Dr. Kennedy incorrectly assumed that all mutual RLI and Metiri customers accessed the TSW database; (2) that Dr. Kennedy did not properly consider the timing of customers' purchase of a Metiri subscription; and (3) that Dr. Kennedy's opinions are not based on customer testimony. Metiri Group, LLC's Second Motion in Limine and Suggestions in Support ("Motion"), 3-5 and 8. Metiri's argument fails because it misrepresents the facts of this case.

Metiri complains that Dr. Kennedy did not determine which RLI customers accessed Metiri's database, and that his failure to do so renders his analysis inadmissible. Motion, 3-4. Metiri is wrong. Under Metiri's myopic view of the facts, only customers who actually accessed the TSW database could have been exposed to Metiri's false and disparaging statements about Accelerated Reader. Metiri conveniently ignores the fact that accessing the database is only one

7

of a number of avenues through which its false statements were spread. The record shows that Metiri's false statements were presented not only on the TSW database, but also in separate reports to individual school districts, public presentations, promotional materials, and advertisements Metiri made available to actual and potential subscribers. In addition, Metiri held seminars in certain subscribers' geographic areas, including the State of Washington (Deposition of Dennis Small ("Small Dep."), attached as Exhibit 5, at 144). Metiri also ignores the fact that Metiri subscribers exposed to the false and disparaging statements could spread those statements by word of mouth to others. Consequently, Metiri's assertion that "only approximately twenty-five percent of the school districts in the State of Washington made active use of the TSW database" is irrelevant. Metiri improperly conflates database access and exposure to the false and disparaging statements. But the two are not the same. Dr. Kennedy's analysis properly includes all Metiri subscribers, regardless of whether they accessed the database, because that is the population most likely to have been exposed to Metiri's statements.

Metiri also complains that Dr. Kennedy did not consider when TSW customers purchased or terminated their Metiri subscriptions. Again, Metiri mischaracterizes the facts of the case. Metiri assumes that exposure to the false and disparaging statements runs concurrently with the duration of a subscription – this defies logic and common sense. Although the TSW database became generally available in 2003, Metiri first started issuing its "reviews" of Accelerated Reader to the Chicago Public School District in 2002. In 2002, the Chicago Public School District purchased $430,563 in Accelerated Reader products. (Chart of RLI's Accelerated Reader sales to the Chicago Public School District, attached as Exhibit 6, at 1)[1]. In 2003, RLI's Accelerated Reader sales to the Chicago Public School District dropped all the way

---

[1] The data reflected in Exhibit 7 is taken from a spreadsheet detailing RLI's revenues from all sales of Accelerated Reader products, delineated by customer, for the time period 1999 – 2008.

down to $174,380 – a decrease of over $250,000 (id.). Additionally, the TSW database was made available to beta testers prior to its general release, thereby exposing customers to the false and disparaging statements pre-subscription. Moreover, the date of a subscription likely comes *after* the first time the subscriber had been exposed to Metiri's statements because Metiri made many of the statements in the course of its advertising for TSW.

Metiri's argument that Dr. Kennedy did not take into account the termination date of a subscription is also not well taken. That argument ignores that fact that once a customer has been exposed to Metiri's statements, the damage to the reputation of Accelerated Reader has already been done, and would continue to cause decreased sales in the future. Inclusion of Metiri customers post-subscription was therefore essential to Dr. Kennedy's accurate assessment of the impact of Metiri's statements. It is also critical to note that although Dr. Kennedy's damages analysis includes losses RLI incurred from certain customers prior to those customers' subscription to the TSW database, the damages analysis also includes sales *increases* over time among Metiri subscribers, regardless of when a customer's subscription began. In fact, Metiri's focus on individual customers completely misses the point of Dr. Kennedy's analysis. The point is that the sales to the group as a whole went down significantly. Sales to some customers may have gone up and some may have gone down, but Dr. Kennedy's analysis does not attempt to measure damages attributable to any one particular customer. His analysis measures damages attributable to the group of schools likely to have been exposed as a whole. Dr. Kennedy's opinion is solidly grounded in the facts of this case, and is consistent with the record.

Finally, Metiri contends that Dr. Kennedy's opinion must be unreliable because RLI has not presented "evidence or testimony from a school or school district" identifying Metiri's product as the reason the customer declined to purchase Accelerated Reader. Motion, 8.

9

Metiri's argument lacks merit because it does not identify any deficiency in Dr. Kennedy's methodology or analysis, and thus does not give this Court any grounds for excluding his opinion. Dr. Kennedy was retained to perform an economic valuation of damages, and customer testimony is not necessary – let alone relevant – to such a valuation. Metiri does not cite to any authority establishing that a damages expert's analysis must be corroborated by lay witness testimony. Accounting analysis, without more, is more than sufficient to sustain an award of lost profits. See, e.g., Forklifts of St. Louis, Inc. v. Komatsu Forklift, USA, Inc., 178 F.3d 1030, 1034-35 (8th Cir. 1999) (the fact that the accountant expert proffered routine damages testimony based on the records and financial information provided by the plaintiff, coupled with vigorous cross-examination by defendant, satisfied Missouri's requirement that plaintiff prove the existence and amount of damages with reasonable certainty); see also Tipton v. Mill Creek Gravel, Inc., 2003 WL 25686521 at *1-2 (W.D. Mo. 2003). Moreover, Dr. Kennedy assessed the statistical significance of his findings; for each year between 2003 and 2008, the likelihood that Metiri-subscribers' purchases of Accelerated Reader lagged behind non-subscribers' for any reason other than Metiri's statements is less than 0.1% (Kennedy Rep., Ex. 1 at 5).

B.    Metiri's Dissatisfaction with the Factual Bases of Dr. Kennedy's Opinions Is Not Proper Grounds for Excluding the Opinions.

Metiri's aforementioned arguments against Dr. Kennedy's opinions relate to the facts upon which Dr. Kennedy relied. As a threshold matter, this approach fails on its face. It is axiomatic that challenges to the factual basis of an expert opinion go to the weight and credibility of the opinion and are not grounds for excluding the expert's testimony. Hartley v. Dillard's, Inc., 310 F.3d 1054, 1061 (8th Cir. 2002); Margolies v. McCleary, Inc., 447 F.3d 1115, 1120-21 (8th Cir. 2006). "As a general rule, the factual basis of an expert opinion goes to the credibility

10

of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis in cross-examination." Hartley, 447 F.3d at 1061 (internal citations omitted).

Metiri fails to cite a single case to the contrary. Instead, Metiri relies solely on Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039 (8th Cir. 2000), and misapplies the court's analysis. See Motion, 3. In Concord Boat Corp., the court held an expert's testimony inadmissible because it found that the expert's analytical model was flawed. Id. at 1056-57. There, the expert derived his opinion regarding complex antitrust damages by relying on a rarely-used economic model that did not incorporate financial data relevant to the defendant's market activity. Id. Concord Boat Corp. is inapposite here because Metiri does not argue that Dr. Kennedy's mathematical computations or statistical applications are erroneously conceived or inherently flawed – rather, Metiri disagrees with the facts on which Dr. Kennedy relied. Metiri is free to critique Dr. Kennedy's opinion through Metiri's own witnesses, evidence, and cross-examination. But Metiri cannot simply sweep away his opinion without subjecting it to the adversarial process. See Children's Broadcasting Corp. v. The Walt Disney Co., 357 F.3d 860, 864-65 (8th Cir. 2004) (court held that defendants' objections to the factual basis of the expert's opinion "were better directed to the weight of the testimony rather than admissibility," and noted that defendants had a full opportunity to cross-examine the expert and present rebuttal expert testimony).

C.     Dr. Kennedy Used a Rigorous Scientific Approach to Develop his Opinions.

      1.      *Dr. Kennedy properly relied on RLI's financial records and had no duty to conduct independent research.*

Metiri argues that Dr. Kennedy's approach was not sufficiently rigorous or scientific for several reasons. Metiri's lead argument in this regard is that Dr. Kennedy did not formulate the research question and relied only on data provided to Dr. Kennedy by RLI's counsel, without

11

independently verifying the data. This argument is meritless because Dr. Kennedy need not have independently formulated the research question or independently verified the financial data provided to him by RLI.

Experts routinely conduct studies to answer questions posed by clients, relying on data provided to them by clients. This is especially true where the expert is an accountant. See, e.g., Komatsu, 178 F.3d at 1035 (accountant was under no obligation to independently verify the records he was given by the plaintiff); see also Tipton, 2003 WL 25686521 at *1-2. In Tipton, the defendant argued that the plaintiff's expert witness, an accountant retained to estimate the value of gravel on the plaintiff's mining site, relied on the plaintiff's damages theory without independently verifying the information he was given. 2003 WL 25686521 at *1. The court stated:

> The opinion [the expert] rendered was supported by the data he relied upon, given the very limited nature of the 'engagement' that he was hired to undertake. He was asked to work within narrow parameters, and given those parameters, he relied on generally accepted mathematical principles to reach his opinion. In doing so, he relied on other experts' reports, as well as information provided by plaintiff. It cannot be said that his opinion was not scientifically based, nor that it was so lacking in indicia of reliability that it should be found inadmissible under Daubert…the weight given to his testimony will be for the jury to decide.

Id. at *2. Like the experts in Komatsu and Tipton, Dr. Kennedy relied on financial records supplied by his client. Al Thurber, the financial controller of RLI, provided the sales data upon which Dr. Kennedy based his analysis, and Metiri was able to examine Mr. Thurber regarding the sales data. (Deposition of Al Thurber ("Thurber Dep."), attached as Exhibit 7, at 30-33, 47-54). Dr. Kennedy was not retained to confirm the accuracy of RLI's financial records. Rather, he was asked to analyze those records over time among different populations. Metiri would have this Court require accountants to independently verify the data underlying a client's sales and operation – a proposition that is plainly absurd.

2.    *Dr. Kennedy's analytical methodology was sufficiently technical.*

Metiri's next complaint about Dr. Kennedy's methodology is that his reliance on "simple arithmetic calculations" is insufficiently scientific or technical. Motion, 7. Metiri oversimplifies Dr. Kennedy's methodology. Metiri's contention that a tenured professor of finance with three decades of experience in complex statistical and financial analysis would limit his assessment of RLI's damages to simple calculations lacking technical accuracy is untenable. In addition to his doctorate in finance, master's degree in accounting, CPA certification, and myriad professional accreditations too numerous to list here in detail, Dr. Kennedy has published extensively on the use of statistics in economic valuation (Kennedy Rep., Ex. 1 at 9-16). His methodical computation of RLI's lost sales and lost profits is based on comprehensive financial data, and his conclusions regarding Metiri's effect on RLI's losses is confirmed by the statistical analysis at page 5 of Dr. Kennedy's report (Id. at 5). As the chart reflects, there is a less than .1% chance that the percentage difference in sales between Metiri subscribers and non-subscribers is attributable to anything other than Metiri. His analysis is sound and Metiri has not established otherwise.

Moreover, even if this Court accepts Metiri's assertion that Dr. Kennedy's methodology consists only of basic mathematics (which RLI maintains it does not), his testimony and report still meet Fed. R. Evid. 702's requirement that the expert's testimony be scientific or technical. See Tipton, 2003 WL 25686521 at *2 (accountant's reliance "strictly on mathematics" and use of "generally accepted, basic mathematical principles to perform his calculations" held sufficiently scientific under Rule 702).

3. *There are no alternate explanations that Dr. Kennedy did not adequately consider.*

Metiri further complains that Dr. Kennedy improperly failed to rule out alternative explanations for RLI's lost sales during 2003 – 2008. Motion, 5-6. Even Metiri, however, cannot identify with reasonable certainty what alternative explanation may exist. The reason for this is simple: there is no alternative explanation. The only identifiable difference common to every member of the group of RLI customers subscribing to Metiri's database is just that – the Metiri subscription. There is no other difference between the control group and the experimental group in Dr. Kennedy's analysis. Metiri's own expert, Christopher Pflaum, concedes that he is not aware of any other factor that would cause a greater drop for Metiri subscribers than non-subscribers (Pflaum Dep., Ex. 4 at 51). The same factors Metiri suggests, albeit without substantiation, that may have affected a customer's purchasing decision (competing products, or changes in funding, for example), are common to both groups; non-Metiri subscribers would also have to contend with such factors. Yet, the difference in sales index between the two groups is markedly different (Kennedy Rep., Ex. 1 at 6). The statistical significance of Dr. Kennedy's analysis further underscores Metiri's role in causing RLI's lost sales (Id. at 5). Statistically, there is a less than .1% chance that anything other than Metiri's product caused the identified percentage difference in the sales index between the two groups (Id.).

Because Metiri has failed to present any evidence challenging the methodology underlying Dr. Kennedy's opinion, his testimony and report are admissible.

14

## III.   CONCLUSION

For the foregoing reasons, RLI respectfully requests that the Court deny Metiri's Second Motion in Limine.

Dated: October 21, 2009                              **BRYAN CAVE LLP**

By:      /s/ K. Lee Marshall
         Robert J. Hoffman, # 44486
         3500 One Kansas City Place
         1200 Main Street
         Kansas City, MO 64105
         Tel. (816) 374-3200
         Fax (816) 374-3300

         K. Lee Marshall (admitted *pro hac vice*)
         James Weiss (admitted *pro hac vice*)
         One Metropolitan Square
         211 North Broadway, Suite 3600
         St. Louis, Missouri 63102-2750
         Tel. (314) 259-2000
         Fax  (314) 259-2020

         **ATTORNEYS FOR RENAISSANCE
         LEARNING, INC.**

### CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following counsel of record:

Lee M. Baty
Theresa M. Otto
Matthew Westerling
Baty, Holm, & Numrich, P.C.
4600 Madison Avenue
Kansas City, Missouri 64112

                              /s/ James M. Weiss

15